IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38229-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLIAM JEFFERSON WILSON, III, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — William Wilson III appeals after a jury convicted him of felony violation of a no-contact order, interfering with reporting of domestic violence, second degree theft, and third degree theft. We affirm his convictions but remand for resentencing and correction of a scrivener's error.

FACTS

William Wilson and Larissa Luttrell were involved in a romantic relationship. In early July 2020, after the relationship ended, Ms. Luttrell obtained a no-contact order prohibiting Mr. Wilson from contacting her.

*Parking lot encounter*

In late August 2020, Ms. Luttrell went to a grocery store with a friend, Gerard Freeman. Ms. Luttrell waited in her truck while Mr. Freeman shopped. Mr. Wilson saw Ms. Luttrell sitting in her truck, opened the truck door, threw a milkshake at her, called

her a bitch, and struck her twice in the face and also on the back of her head.  Mr. Wilson

took her cell phone and told her she would not need it.  He also took Mr. Freeman's cell

phone.  A woman in the parking lot called 911 for Ms. Luttrell and police responded.

The State charged Mr. Wilson with five offenses: (1) felony violation of a no-

contact order including assault, (2) interfering with reporting domestic violence,

(3) theft in the second degree of Ms. Luttrell's cell phone, (4) theft in the second degree

of Mr. Freeman's cell phone, and (5) robbery in the first degree, including the infliction

of bodily injury.  All charges except the theft of Mr. Freeman's cell phone included an

allegation of domestic violence against an intimate partner.

*Trial*

Ms. Luttrell testified about the events in the parking lot, including her recollection

of Mr. Wilson hitting her:

> [Ms. Luttrell:]  I know he hit me in the face twice.  And then after
> that, I just covered my head and just was feeling for the door—I wasn't
> really counting, so.  But at least three, four times at least on the back of the
> head.
> [The State:]  So he hits you.  Do you remember was he using his fist
> or his palm or something else?
> [Ms. Luttrell:]  His fist.
> [The State:]  Okay, so he hits you with his fist twice in the face, is
> that right?
> [Ms. Luttrell:]  Yeah.  I kind of like jerked back so it wasn't—but I
> know for a fact it was—and I could feel the fist—the knuckles on the back
> of my head.

2

Report of Proceedings (RP) at 66.  She also testified about her cell phone:

> [The State:]  . . .  And what was your phone like that he took?
> [Ms. Luttrell:]  An iPhone 11.
> [The State:]  And was it fairly new?
> [Ms. Luttrell:]  Yes, I had purchased it less than a month ago.
>     THE COURT:  Wait, when did you purchase?
>     [Ms. Luttrell:]  Less than a month before.
> [The State:]  Do you remember how much you paid for it?
> [Ms. Luttrell:]  Like $900 or $1,000.

RP at 75.

The Cle Elum Chief of Police Kirk Bland had responded to the assault.  He testified about the injuries he observed on Ms. Luttrell:  "I saw a visual mark—she had a red, like a small cut on the bridge of her nose and close to her eye.  And she was holding the back of her head, but I couldn't see any injuries on the back of her head."  RP at 111.  The State questioned Chief Bland about whether the cut appeared recent:

> [The State:]  Do you have an opinion about—I know you're not a doctor and you can't age it or time it—did that wound that you saw there appear to you to be fresh, from your experience?
>     . . . .
> [Chief Bland:]  It was consistent with other wounds over the last 30 years for recent assault victims that I've investigated.  It looked fresh to me, yes.
> [The State:]  Didn't have any scabbing over top of it?
> [Chief Bland:]  Don't remember that, no.
> [The State:]  Can you see in the pictures—is it still like actively bleeding at all or do you remember that?
> [Chief Bland:]  I don't remember any blood running down her face, no.

3

RP at 112.

Mr. Freeman testified that he had purchased his cell phone for about $200. After the State rested, Mr. Wilson moved to dismiss the charge of second degree theft for Mr. Freeman's cell phone since its value did not meet the threshold for felony theft. The State requested leave to amend to the lesser included offense of third degree theft. The court granted the State's motion.

After closing arguments, the clerk randomly selected which of the 13 jurors would be the alternate; juror 1 was chosen. Juror 1 was temporarily excused from further service.

The jury found Mr. Wilson guilty of counts 1 through 4, but acquitted him on count 5, first degree robbery. It found Mr. Wilson and Ms. Luttrell were intimate partners and members of the same household on all charges for which it was alleged. The court individually polled each of the 12 jurors, who confirmed the correctness of the verdict.

After the jury was dismissed, Mr. Wilson's attorney questioned why juror 1 had returned with the rest of the jury. The court stated juror 1 had been excused, but noted the court had just spoken with juror 7 who had been behind juror 1 previously. Mr. Wilson's attorney acknowledged he may have misread the numbers. The prosecutor stated she had not seen juror 1, and the court agreed, "I didn't think she was back." RP at 219.

4

<u>*Sentencing*</u>

At sentencing, the parties agreed that Mr. Wilson's offender score was a 5.

However, Mr. Wilson's attorney indicated he only had an opportunity for a cursory

review of Mr. Wilson's criminal history and there was some question over whether any of

Mr. Wilson's prior convictions should wash out. The court acknowledged this and stated:

> [W]hat we're going to do is I'm going to proceed as though that's the
> correct offender score. . . . Then if it turns out that the Defense finds
> information that leads them to believe that these aren't [sic] the correct
> score, then you may bring it back before the Court for re-sentencing.

RP at 225. Mr. Wilson was sentenced to 43 months' imprisonment based on the offender

score of 5, with 12 months' community custody.

The court imposed the following legal financial obligations (LFOs): a $500 victim

assessment, a $200 criminal filing fee, and a $100 booking fee. The court struck a $100

DNA[1] collection fee because Mr. Wilson already had his DNA collected in a prior case.

The judgment and sentence had the four fees preprinted with a total of $1,500 also

preprinted. The court crossed out the $100 for the DNA collection fee and the $1,500

total, handwriting in a total of $1,400. The court read out, "So without the restitution, it

comes out to $1,400 . . . . So that's $500 of victim assessment; $200 court costs; and

---

[1] Deoxyribonucleic acid.

$100 for the booking fee. So that comes out to $1,400 plus then whatever the restitution is for the telephones." RP at 240.

Mr. Wilson appeals.

ANALYSIS

SUFFICIENCY OF EVIDENCE OF CELL PHONE VALUE

Mr. Wilson contends there was insufficient evidence at trial of Ms. Luttrell's cell phone's market value. We disagree.

In a challenge to the sufficiency of the evidence, we consider "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We draw all reasonable inferences in favor of the State and against the defendant. *Id.* "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.*

Mr. Wilson was convicted of second degree theft, which required the State to prove the value of the stolen iPhone was at least $750. RCW 9A.56.040(1). "Value" as used in theft statutes means market value at the time and approximate location of the theft. RCW 9A.56.010(21)(a). "Market value" is "'the price which a well-informed buyer would pay to a well-informed seller, where neither is obliged to enter into the

transaction.'" *State v. Longshore*, 141 Wn.2d 414, 429, 5 P.3d 1256 (2000) (quoting

*State v. Kleist*, 126 Wn.2d 432, 435, 895 P.2d 398 (1995)). Evidence of the price paid is

entitled to great weight if it is not too remote in time. *State v. Jussila*, 197 Wn. App. 908,

934, 392 P.3d 1108 (2017).

At trial, Ms. Luttrell testified she had bought her iPhone less than one month

previously, it was fairly new, and she had paid $900 to $1,000 for it. The jury could

rationally infer that the phone had not lost substantial value in the intervening weeks and

had a market value of over $750.

Mr. Wilson argues Ms. Luttrell's testimony about purchase price went toward the

replacement cost of the phone, not the market value of the phone. He presents two cases

to support his position that Ms. Luttrell's testimony about the recent purchase price was

insufficient for the jury to infer a market value of $750.

The first is *State v. Morley*, 119 Wn. App. 939, 941, 83 P.3d 1023 (2004), where

the defendant was charged with theft of two generators from an equipment rental

company. A witness testified that the depreciated book value of the smaller generator

was $665.92. *Id.* He was unsure of the depreciated value of the larger generator, but

testified that it would cost $2,000.00 new, excluding the discount the retailer provided the

7

rental company.  *Id.* at 941-42.  The witness did not testify when the company had

purchased the second generator, how often it had been leased out, or its condition.

We held there was insufficient evidence that the larger generator was worth more

than $1,500, the threshold for first degree theft at the time.  *Id.* at 942-43.  We concluded

that the retail price was not evidence of its fair market value in that case.  *Id.* at 944.

The second case Mr. Wilson relies on is *State v. Ehrhardt*, 167 Wn. App. 934, 938,

276 P.3d 332 (2012), in which the defendant was charged with theft of a number of

construction-related items from a homeowner's shed: an air compressor, a pressure

washer, wiring parts, rotary hammers, and nail guns.  The homeowner testified he had

bought the air compressor for $100 five or six years ago, but had never used it and it was

in new condition.  *Id.*  He testified he had purchased the pressure washer for $199 within

the last year and that he had acquired the wiring parts over time for about $300, but that

they were worth about $100 at the time they were stolen.  *Id.*  He testified that the rotary

hammers and nail guns belonged to his employer, were about three years old, and had cost

about $450 and $230 each, respectively, when purchased.  *Id.*  We held that the

homeowner's testimony was sufficient for the jury to find the market value of the air

compressor, pressure washer, and wiring parts because he testified to their condition or

their contemporaneous value.  *Id.* at 945.  His testimony was insufficient to establish the

market value of the rotary hammers or nail guns, however, as they had been used as professional construction tools for three years and the homeowner had not testified about their condition or their contemporaneous value. *Id.* at 945-46.

Neither case supports Mr. Wilson's argument; indeed, *Ehrhardt* runs counter to it. The *Ehrhardt* court found that purchase price *was* sufficient evidence of the market value of the pressure washer one year after purchase and of the air compressor *six years* after purchase because they were "essentially new." *Id.* at 945. Similarly, from Ms. Luttrell's testimony about her essentially new phone's purchase price of $900 to $1,000 weeks earlier, the jury could infer the phone maintained a market value of more than $750 just weeks after purchase.

Mr. Wilson argues that the value of the iPhone had dropped because Ms. Luttrell had unlocked it and connected her accounts to it; however, this use is not at all comparable to that of the construction tools in *Morley* or *Ehrhardt*. The intangible act of logging into one's accounts on a phone is completely reversible and is not akin to physical wear and tear that affected the generators, rotary hammers, and nail guns in those cases and led to unknown amounts of depreciation.

Viewing the evidence in the light most favorable to the State, based on Ms. Luttrell's testimony about the weeks-old iPhone's purchase price, a jury could rationally find that the phone's market value at the time Mr. Wilson took it was greater than $750.

SUFFICIENCY OF EVIDENCE OF OFFENDER SCORE

Mr. Wilson next contends the State failed to prove a prior conviction did not wash out at sentencing; the State concedes this point. We agree and remand for resentencing.

Offender scores are reviewed de novo. *State v. Tili*, 148 Wn.2d 350, 358, 60 P.3d 1192 (2003). "[T]he State has the burden to prove prior convictions at sentencing by a preponderance of the evidence." *State v. Hunley*, 175 Wn.2d 901, 909-10, 287 P.3d 584 (2012). This includes establishing that an offense does not wash out under RCW 9.94A.525(2). *See State v. Cross*, 156 Wn. App. 568, 586-87, 234 P.3d 288 (2010), *modified on remand*, 166 Wn. App. 320, 271 P.3d 264 (2012). "[A] sentence that is based upon an incorrect offender score is a fundamental defect that inherently results in a miscarriage of justice." *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 868, 50 P.3d 618 (2002).

Mr. Wilson argues two prior class C felonies should presumptively wash out under RCW 9.94A.525(2)(c) because there was more than five years between one of those convictions and the conduct in this case. The State concedes that the adult felony was

included in the offender score without any evidence that it should not wash out. It agrees resentencing is appropriate, but argues the State should have an opportunity to present evidence showing Mr. Wilson's prior class C felonies should not wash out.

Under RCW 9.94A.530(2), "On remand for resentencing following appeal or collateral attack, the parties shall have the opportunity to present and the court to consider all relevant evidence regarding criminal history, including criminal history not previously presented." This is intended "'to ensure that sentences imposed accurately reflect the offender's actual, complete criminal history, whether imposed at sentencing or upon resentencing.'" *State v. Jones*, 182 Wn.2d 1, 10, 338 P.3d 278 (2014) (quoting LAWS OF 2008, ch. 231, § 1). Thus, on remand, the State may present evidence that Mr. Wilson's class C felonies did not wash out to ensure his criminal history is accurate and complete.

ERRONEOUS LFO TOTAL

Mr. Wilson contends his judgment and sentence incorrectly totals his LFOs, and the State concedes it was a scrivener's error. We agree.

A scrivener's error is a clerical mistake that, when amended, would correctly convey the trial court's intention based on other evidence. *State v. Davis*, 160 Wn. App. 471, 478, 248 P.3d 121 (2011). Here, the LFOs total $800, not $1,400. We remand for the court to correct Mr. Wilson's total LFOs to $800.

11

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG) NO. 1:
DELIBERATION BY ALTERNATE JUROR

Mr. Wilson contends the alternate juror improperly deliberated with the 12 jurors.

We disagree.

The record shows that juror 1 was chosen to be the alternate. After the jury

reached a verdict and returned to court, the trial court read the verdicts and polled each of

the 12 jurors. It did not poll a 13th juror. Defense counsel briefly thought he had seen

juror 1 reenter the courtroom with the jury. The prosecutor and the court confirmed they

had not seen juror 1 in the courtroom. Defense counsel concluded he must have misread

a 7 as a 1. The record does not support Mr. Wilson's claim that the alternate juror

deliberated (and returned) with the 12 jurors.

SAG NO. 2: TESTIMONY THAT INJURIES WERE FROM PUNCHING

Mr. Wilson contends that a nonexpert witness (a police officer) improperly

interpreted the victim's wounds as being from punches "when the pictures cleary [sic]

show evidence of scratching!"

We note that Mr. Wilson did not object to the officer's testimony as improper lay

opinion. Under RAP 2.5(a), this unpreserved evidentiary issue is not reviewable.

Nevertheless, the issue raised is of no consequence. To prove felony violation of a no-

contact order, the State needed to prove Mr. Wilson assaulted a person he knew was

protected by a no-contact order. An "assault" is "an intentional touching, striking, or

cutting of another person . . . ." Clerk's Papers at 96. Thus, whether Ms. Luttrell was

struck or cut (scratched) is immaterial.

Affirmed in part; remanded for resentencing.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____    _____
Siddoway, C.J.                             Staab, J.